

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

ORIGINAL    DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAR 19 2012

CLERK, U.S. DISTRICT COURT
By_____
Deputy

| | | |
|---|---|---|
| Austin Dylan Eversole, #1626507<br>Petitioner | § | |
| | § | |
| v | § | 3:11-CV-1478 (BK) |
| | § | |
| Rick Thaler, Director, Texas<br>Department of Criminal Justice,<br>Correctional Institutions Division,<br>Respondent | § | |
| | § | |

### PETITIONER'S SPECIFIC OBJECTIONS TO MAGISTRATE'S

### FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS

To the Honorable Judge of the United States District Court for the Northern
District of Texas, Dallas Division:

Now respectfully appears Austin Dylan Eversole, Petitioner in this
cause and files these specific objections to the Magistrate Judge's findings,
conclusions, and recommendation followed with the basis for the objections
and the specific place in the Magistrate's report and recommendation where
the disputed determination is found.

### I.

### SPECIFIC OBJECTIONS

1.      Petitioner objects to findings and conclusions on page 2 of the
Magistrate's report, footnote 2 stating that June 22, 2011 was "the earliest
possible date Petitioner could have handed his petition to prison officials for
mailing"; and footnote 3 "Petitioner's pleadings even when liberally construed,
allege no state-created impediment..."

2.      Petitioner objects to the findings and conclusions on Pg 4 of the
Magistrate's report that he "Squandered the entire one-year period", and
"Clearly failed to act with due diligence", "at the outset" and the assertion
that Petitioner waited until something was wrong to file his petition.

29

3.        Petitioner objects to the findings and conclusions on Pg 2 of the Magistrate's report that he is not entitled to equitable tolling due to his pro se status because "pro se status is not a 'rare and exceptional' circumstance because it is typical of those bringing a §2254 claim."

4.        Petitioner objects to the findings and conclusions on Pg 5 of the Magistrate's report stating Petitioner's cause "does not present exceptional circumstances warranting equitable tolling." Petitioner objects to the findings and conclusions that he relies only on "his youthful offender status as a basis for equitable tolling."

5.        Petitioner objects to the findings and conclusions on Pg 6 of the Magistrate's report that merely because "TDCJ's records...reflect Petitioner visited the law library 14 times between May 2010 and December 2010—before his 18th birthday" and because visits lasted 1-2 hours, that he had adequate access to a law library. Petitioner objects to the finding and conclusion that "Petitioner could have requested a legal visit with a GP inmate even as a youthful offender."

6.        Petitioner objects to the findings and conclusions on Pg 7 of the Magistrate's report that "his pleadings are silent as to whether and when he would have made such a request" for a legal visit with a GP inmate.

## II.
## BASIS FOR OBJECTIONS

7.        (1) June 22, 2011 was not the earliest possible date the Petitioner could have handed his petition to officials for mailing. His petition would have been filed on or before the April 1, deadline, but for the state-created impediment. The findings state there is nothing that prevented his timely filing, even when liberally construed. Plaintiff asserts that the

the conditions described combine to have the overall affect of a state-created impediment preventing the timely filing of his habeas corpus.  When these conditions are combined and then liberally construed this state-created impediment preventing the timely filing present.

8.          (2)  The Petitioner did not squander his one-year filing period. He worked diligently to meet the filing deadline—visiting the law library 14 times from May 2010 to December 2010 learning how to apply the law to his case.  Legislative statutes, court rules and procedures add up to create a formidable standard for a pro se juvenile inmate to pass muster.  Indeed, even licensed attorneys have a certain degree of difficulty with this.  The Petitioner argues that his writ and motion for extension of time failed because it was decided that it should be denied before the motion was reviewed.  The basis for this is in the findings and conclusions on Pg 4 when the Court noted "at the outset" that the Petitioner "clearly failed to act with due diligence." The Petitioner asserts that he did not wait until something was wrong before filing his writ, as stated on Pg 4 of the findings.  He visited the unit law library and worked diligently.  Once released from the Youthful Offender Program he sought legal assistance from GP inmates.  Within a few weeks his writ was filed.  There is no way to conclude from this the Petitioner was "sitting on his rights."

9.          (3)  As objected to in paragraph 3 of this document, the Magistrate concludes the Petitioner is not entitled to equitable tolling due to his pro se status because "pro se status is not a rare and exceptional circumstance because it is typical of those bringing a §2254 claim."  The basis of the objection is this precedent is not being interpreted in a manner compatible with **Mathis V Thaler, 616 F3d 461, 474 (5th Cir. 2012)** stating "Courts must

consider the individual facts and circumstances of each case in determining whether equitable tolling is appropriate." The Court already stated it decided at the outset the Petitioner did not have a chance at equitable tolling.

10.    The individual circumstances in the Petitioner's case which combined resulting in late filing of his petition should allow equitable tolling of the same. The Court did not consider docket 59676 from the 378th District Court in Ellis County, Texas, where that court determined the Petitioner was the victim of abuse by his father. The abuse was traumatic for the Petitioner and included covert sexual abuse—his father pulling his pants off and spreading his buttocks and forcing the Petitioner to stare at his anus, being forced to sleep in the same bed as his father wearing only his underwear until he was 14 years old. Petitioner suffered physical, psychological, and emotional abuse as well. The Petitioner was treated by Dr. Alex Hollub for Post Traumatic Stress Disorder, Attention Deficit Hyperactivity Disorder, and what has come to be called Battered Child Syndrome. The Petitioner had been damaged to the point he had difficulty controlling his emotions and was prescribed potent medi-cation. His own abuse aside, he watched his father beat his mother repeatedly in his childhood years. A Temporary Restraining Order was finally issued. (see Attachment-6).

11.    The Petitioner was in his 3rd month of incarceration trying his best to overcome the shock of being underage in an adult prison. This is when he gets extorted be offender Jeremy Washington. The extortion took place by Washington forcibly taking the Petitioner's property under threat of physical harm to the Petitioner. Under TDCJ Administrative Directive 3.03 this constituted extortion. Petitioner reported the extortion and was put in administrative segregation for the investigation. Only three months prior to this the Petitioner was at his home with family.

12.    Setting aside the fact the Petitioner was convicted, which meant

he was going to prison with adults, there were negative emotional and psycho-
logical effects of a Juvenile living with the damage he caused, being torn away
from the remaining family that had not disowned him, and being relocated to
the other side of the 2nd largest state in the United States, several hours
away from any relative.  Everyone was a stranger, and he just got extorted by
a violent offender.

13.      The Court concluded the Petitioner failed to explain how this
affected his developmental disorders, thereby contributing to his late petition.

### III.
### POST-TRAUMATIC STRESS DISORDER

14.      The National Institute of Mental Health* (NIMH) reports that
children get Post-Traumatic Stress Disorder (PTSD) after witnessing or being a
victim of violence, or watching a loved one get hurt. The Petitioner experienced
both instances.  PTSD can start right after a traumatic event, or not manifest
for months or years later.  PTSD sufferers experience one or more of the
following problems: angry outbursts; feeling on edge; feeling alone; trouble
sleeping; feeling worried, guilty, or sad; thoughts of hurting themselves or
others; bad dreams; scary thoughts they can't control; hiding from places that
remind them of the traumatic event; reverting to childhood behavior patterns.
These symptoms are real and painful to the sufferer.  Even with PTSD the
Petitioner was showing positive potential in a prison setting.

### IV.
### ATTENTION DEFICIT/HYPERACTIVITY DISORDER

15.      Attention Deficit/Hyperactivity Disorder (ADHD) presents a plethora
of emotional and psychological issues for those diagnosed with it.  NIMH

*U.S. Department of Health and Human Services, National Institute of Mental Health.
 6001 Executive Boulevard, Room 8184, MSC 9663, Bethesda, MD 20892-9663. Ph:(301)-443-4513

reports there is no cure for ADHD, but it can be treated with medication, therapy, or both.

16.     The brain of a juvenile is still very much in its developmental phase.  In fact, it does not begin resembling an adult's brain until their early 20s.  This is the dorsal prefontal cortex, which plays a critical part in a teenager's decision-making process.  This is supported by the Centers for Disease Control, National Science Teacher Association, and the U.S. Department of Transportation National Highway Traffic Safety Administration[2].

17.     The argument can be made that not all the kids who suffer from these conditions commit crimes.  That's because each person's body and mental health, and experiences are unique in themselves.

18.     The failure to protect that led to the extortion of the Plaintiff was the direct cause of the relapse of the Petitioner's conditions.  The situation in the Petitioner's childhood causing his trauma and diagnosis is also a major childhood developmental issue being recognized in our legal system.

## V.
## BATTERED CHILD SYNDROME

19.     Battered Child Syndrome (BCS) is recognized as a legitimate childhood developmental issue linked directly to parricide cases. (See Attachment 1).  Attachment 1 to this document is a medical article published by The Journal of the American Academy of Psychiatry and the Law, written by Dr. Carl P. Malmquist, MD, MS.  Attachment 1 to this document is titled "Adolescent Parricide as a Clinical and Legal Problem." Petitioner requests

[2].U.S. News & World Report, Volume 147, Number 2, February 2010.

this document be considered by the Court as an objection to the findings,
conclusion, and recommendation of the Magistrate.   The article describes
the Petitioner's mental health condition long before entering prison.   The
Petitioner further requests the attachments to this document be entered into
Court record. (see Attachments 1, 4-6 ).

20.        The Petitioner is smart and articulate, typical among a child
suffering from BCS.   His extortion was damaging psychologically, emotionally
and mentally.   By normal accounts he would have been treated by mental health
professionals.   But his mental health condition is far from normal.   He
reported the extortion as he was supposed to.   TDCJ documents will show there
was an Offender Protection Investigation (OPI).   The outcome is never reported
to an offender.   However, a common response is "no evidence found."   Some of the
Petitioner's property was returned to him.

21.        The Petitioner has boyish, baby-faced features (See Attachment 2).
This has been a constant contributing factor to his problems in prison.   He
became aloof and reserved, survival techniques he learned from years of abuse
from his father.   He concentrated on graduating the Youthful Offender Program.
He became the librarian and worked to get his GED.   Eventually the Petitioner
earned a "silver band", the highest level of the program.   He even became the
first Youthful Offender to enroll in college.   He is still in college and is
doing quite well. (See attachment 2) .

22.        The Petitioner struggled greatly with his mental health and the
relapse caused by the extortion.   It affected his retention of information and
facts.   It affected his sleeping and eating.   He lost his appetite altogether
on many days, and he found it impossible to stay asleep once he fell asleep.
Still, he managed to make it to the law library 14 times.   There were instances

when he was simply too exhausted emotionally and physically to study and retain the law as it applied to his case. In order to remain in the law library TDCJ Rules and Regulations require him to be actively working on some form of legal-related work. This being the case he had to leave.

23.      The Petitioner's college began to suffer as well because of the extortion. He failed one of his favorite classes, biology. However, thanks to classroom tutoring with other GP inmates the Petitioner was able to maintain excellent grades in other classes (See Attachment 3).

24.      Unfortunately, the Clemens Unit instituted a rule in the law library that separated Youthful Offenders from all GP inmates during law study sessions. Before this rule the Petitioner was seeking meaningful help and advice from older GP inmates regarding his case. He was on the path to having his §2254 filed well before the one-year deadline. The Petitioner could no longer seek this advice and this document now before the Court is a testament to the negative affect that policy caused for him. Attachment 3 of this document shows the Petitioner was capable of learning and retaining information and facts when tutored.

25.      The Offender Orientation Packet issued to inmates on the Clemens Unit, Pgs 15 and 16, under Section XII, mentions nothing about an offender being allowed to request a legal visit with another inmate. To the contrary, Pg. 22 of the Offender Orientation Packet issued to inmates on Clemens, Section XXIII., titled "OFFENDER LEGAL SERVICES" states: "Offenders wanting assistance with a legal problem should send an I-60 by truck mail to the Staff Counsel for Offenders in Huntsville." The Petitioner did this, but the Counsel was unable or unwilling to assist him. The Petitioner reasserts his claim that the Clemens Unit administration communicated to Youthful Offenders in a manner that any reasonable person in the same or similar circumstances as the

Petitioner would deduce that legal visits with GP inmates were not permitted. It was further communicated by the Administration that any contact between a Youthful Offender and a GP was prohibited.  Inmates were informed by the Administration that a disciplinary case for both inmates would result.

26.        Communication between parties is an intrinsic part of the legal process.  For instance, judges must inform a defendant what rights are being waived when he/she pleads guilty in a criminal case.  Judges must also warn a defendant of the setbacks that are inherent to pro se representation at trial.  It does not satisfy the American criminal justice system for a court to simply tell a defendant that he/she knew or should have known those rights. Nor is it satisfactory in American jurisprudence to say all a defendant had to do was ask.

27.        A double standard applies here against the Petitioner.  The Clemens Unit Law Library is his only access to the courts.  It's supervisor is appropriately called "Access to Courts Supervisor."  This law library  is the beginning point for all inmate litigation.  The courts hold themselves to a higher standard by informing defendants of their rights and privileged rights in a proceeding.  The same standard should apply to the Access to Courts Program in TDCJ.  It was and still is not posted anywhere in the Clemens Law Library that inmates may request a legal visit with each other.  Please refer to paragraph 25 of this document, showing what information inmates are given regarding legal services.  The Clemens Unit has basically stated, if any juvenile entering the system doesn't know what to do it's not our problem. If he doesn't meet his filing deadlines, oh well.

## VI.
### THE LANGUAGE OF THE COURT

28.       Prisoners have a Constitutional right of access to courts.  This says a prison must either provide a law library and give inmates adequate access to it, or hire people to help inmates with their cases.  The right of access includes authorities protecting an inmate's right to file meaningful legal documents, **Bounds V Smith 430 U.S. 817**.  The Petitioner has a non-frivolous §2254 before this Court.  He missed his filing deadline because of a state-created impediment.  He has met the requirements set forth in **Lewis V Casey, 518 U.S. 343**.

29.       The Sixth Amendment to our Constitution protects a defendant's rights stating he must understand the language of the forum.  This is even included in the Texas Constitution **Art 1 § 10** The Petitioner is a juvenile with a mental health set back from the effects of severe abuse.  He understands the English language. What he does not understand is the language of the forum or the proceedings of the court.

30.       A juvenile who is certified as an adult, tried, convicted and sentenced as an adult, such as the Petitioner, is not given the emotional, mental or psychological thinking or reasoning capacity of an adult by virtue of that certification.  Clearly, the criminal justice system recognizes this mental deficiency, because it separates inmates under 18 from General Population.  In fact, the TDCJ Classification and Administrative Segregation Plan allows for the Youthful Offender to remain separated in the Program after the age of 18 if needed.

31.       The Petitioner asserts that simply allowing him to sign in and look at complicated legal jargon and legislative statutes in a law library were not enough, in his instance, to constitute adequate access.  The relapse caused by the extortion negatively affected his thinking, retaining and cognitive learning capability.

32.          No court takes pleasure in sentencing a juvenile.  American jurisprudence cannot expect a juvenile offender to have the same mental and emotional capacity of an adult, needed to construct a habeas corpus in the Petitioner's circumstances, that will pass muster.  Recent cases like **JDB V North Carolina**[3] recognize a juvenile offender's limited mental and emotional capacity when confronted with something as complex as the law.

33.          Every inmate knows he must file a writ of habeas corpus to challenge one or more aspects of his conviction.  What is being challenged by the state is it is not the TDCJ's fault the Petitioner was ignorant.  This case is not one of ignorance.  This is a matter of equity.  The Petitioner worked diligently and perserved under the mental, emotional, and psychogical conditions mentioned herein.  He achieved his goal of filing his §2254.  He exhausted his mental health stamina pushing to meet the deadline, and is now in a Mental Health/Mental Retardation group therapy that meets weekly under Mental Health Liason Adrianne Bowers.  The Petitioner is working now to reverse his mental health relapsed state caused by the state-created impediment.  In this particular case now before the Court, it is a remarkable feat, not a lack of due diligence, that the Petitioner was only a few weeks late being filed.

34.          Our Constitutional framers gave protection to defendants by mandating an accused person's right to know the evidence against him, have trial proceedings interpreted in a language he can understand, and even have the language of the forum made understandable for him.  Interpreters of the Constitution would correctly presume "an accused" includes persons of any race, creed, class, age, or nationality.  A more narrow interpretation

---

[3] Petitioner does not have access to the citation number for this case.  It is a recent U.S. Supreme Court case.  Petitioner is working diligently to find the citation number.

of our Sixth Amendment includes, in this case, how the Court interprets and applies the Founding Father's meaning and intention regarding the developing, inadequate mental capacity of this juvenile Petitioner to effectively prepare a writ of habeas corpus that would have any hope of withstanding challenges of paid staff attorneys working for the Office of the Attorney General, under the conditions described herein. A testament to the greatness of our Constitution is that it challenges our criminal justice system to stay the course and remain the leader of the free world.  One way it does this is by setting guidelines, rules, and laws that protect the rights of the most dispicable criminals with the same tenacity of the actual innocent.

35.        Had the Petitioner known he had the right to request a legal visit with GP inmates he would exercised that right to its full extent from the first day he arrived at Clemens Unit.  Youthful Offenders and GP inmates were separated and warned by the Clemens Unit Administration that contact between Gp and Youthful Offenders would result in disciplinary cases for both.  A paradox is created in this, because in order to have a legal visit with an inmate both inmates must submit I-60 requests to the law library stating who they want the legal visit with, the inmate's number and why they want to visit with them.

36.        It is an unfair burden upon inmates to tell them they must apply for a legal visit in the manner described above, and then forbid them under threat of disciplinary to communicate with each other.  Since the application process established by the TDCJ would require some form of communication between the two inmates, they are now encouraged by the system to utilize subterfuge by passing notes (known as kites) through another inmate, or by passing verbal messages through another inmate. This undermines the intent of the rehabilitative goal of any correctional institution.  Moreover, no

correctional goal or penological interest is met in this paradox.

## VII.
### PRECEDENT

37.          The Petitioner is not asking the Court to part from precedent.
The Petitioner is respectfully asking the Court to reconsider the recommend-
ations, findings, and conclusions of the Magistrate and apply the Petitioner's
circumstances to the original intent of the Equitable Tolling rule.  The
Petitioner's circumstances call for equitable tolling.  The Petitioner has
in no way meant to harass the Court or the Attorney General's Office through
this or any other filing.  His petition was not so late that it would be a
mockery of justice for tolling to apply.


### PRAYER

  Petitioner prays the Court will sustain the Petitioner's objections and
find in favor of the Petitioner.  Petitioner prays the Court will find
cause for equitable tolling exists in this case because Petitioner worked
diligently to meet Court deadlines.  Accordingly, Petitioner prays the Court
will allow his §2254 to proceed.


                                        Respectfully Submitted,

03-13-2012                              *Austin D. Eversole*
DATE                                    Austin D. Eversole

Austin D. Eversole, #1626507
Clemens Unit
11034 S. Hwy 36
Brazoria, TX 77422

Clerk, U.S. District Court

1100 Commerce St., Rm. 1452
Dallas, TX 75242

RE: **Eversole V Thaler, 3:11-CV-1478 (BK)**

Dear Clerk of Court:

Enclosed please find PETITIONER'S SPECIFIC OBJECTIONS TO MAGISTRATE'S FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS.  Please file this and bring it to the attention of the Court.

Respectfully Submitted,

Austin D. Eversole

Please advise me when the Court sets this motion for hearing.

ENCLOSURES: 6 Attachments



RECEIVED
MAR 1 9 2012
____ EBA.M

Austin D. Eversole, #1626507
Clemens Unit 36
11034 S. Hwy 36
Brazoria, Tx 77422

Clerk, U.S. District Court
1100 Commerce St., Rm. 1452
Dallas, Tx 75242

LEGAL MATERIAL

Attachment 1

REGULAR ARTICLE

# Adolescent Parricide as a Clinical and Legal Problem

Carl P. Malmquist, MD, MS

Criminologists contribute to the knowledge regarding the continuing problem of parricide by way of macrostudies, utilizing large samples that reveal patterns of how such acts are carried out, gender differences, and other aspects. Clinicians have the opportunity to pursue microinvestigations into the details of how cognitive processes and emotions operate in the adolescent who engages in such behavior. Such investigations entail pursuing specifics in the psychosocial realm, such as earlier maltreatments and ongoing psychological conflicts, and also being alert to the neurobiological differences between adolescents and adults. The use of battered child syndrome as a legal defense is discussed, with contrasts made between relying on a posttraumatic stress disorder (PTSD) approach and a duress defense, based on explanations related to shame and humiliation.

J Am Acad Psychiatry Law 38:73–9, 2010

Adolescents who kill their parents remain a challenging group clinically and legally. Clinical descriptions are often based on reports from forensic settings and reflect different theoretical viewpoints. Psychiatric approaches thus offer a micropicture based on case studies or demographic data.[1] Adolescent parricides have diverse diagnoses in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DSM-IV-TR).[2] Although a minority may be psychotic, diagnoses are usually of major depressive disorder, bipolar disorder, or some type of conduct disorder. Comorbid substance abuse problems are frequently present. Victims may be fathers or mothers or both parents. The killing of the entire family (familicide) is seen as a different clinical entity.

Apart from the psychiatric perspective, diverse methodological approaches have been used to study parricides. A criminological approach offers descriptive data extracted from large samples. Heide and Petee[3,4] utilized the Supplementary Homicide Reports from the FBI to obtain data on offenders, victims, and weapons. In a 25-year period (1976–1999) 5,781 biological parricide victims (omitting stepparents), and 5,558 offenders were found. Arguments over money and other matters were the precipitating events in 81 percent of the patricides and 76 percent of the matricides. Handguns, rifles, and shotguns were used in 62 percent of patricides, whereas knives (27%) and handguns (23%) were the dominant weapons in matricides. Their study was not confined to adolescents, but they reported that 25 percent of the patricides and 17 percent of the matricides were committed by persons less than 18 years of age. Compared with adults, adolescents were more likely to use a firearm (57%–80%), a finding that the authors hypothesized as being related to the physical disparity between the parties. By extension, that most adolescent parricides occur in a nonconfrontational setting is also related to physical differences. Rather than acting when the parties are facing off against each other directly, the physically weaker perpetrator uses more covert means to accomplish the homicide.

Another investigation was based on coroners' reports of parricides in Quebec from 1990 to 2005.[5] Sixty-four parents were killed (37 patricides and 27 matricides) by 54 perpetrators (52 sons and 2 daughters). Separate data on the adolescents among the offenders were not provided, but the age range was 14 to 58 years, with six of the offenders under the age of 20. The conclusion was that 70 percent of those committing matricides and 63.9 percent of those committing patricides had a psychosis-induced motive, with 30 percent being intoxicated at the time. A commentary on the article proposed two categories:

Dr. Malmquist is Professor of Social Psychiatry, University of Minnesota, Minneapolis, MN. Presented as the Manfred S. Guttmacher lecture at the annual meeting of the American Psychiatric Association, San Diego, May 20, 2007. Address correspondence to: Carl P. Malmquist, MD, MS, 909 Social Science Building, University of Minnesota, Minneapolis, MN 55455-0499. E-mail: malmq001@umn.edu.

Disclosures of financial or other potential conflicts of interest: None.

adolescents with a cataclysmic reaction to enduring physical abuse, and adults with an untreated psychosis and conflicted relationships with their parents.[6] The commentators suggested extending studies to nonlethal acts of child-on-parent violence.

Recently, a special legal defense has been introduced in adolescent parricide cases: battered child syndrome (BCS), connected to posttraumatic stress disorder (PTSD), and analogous to battered woman syndrome (BWS). This defense has raised questions about the differentiation of parricides by adolescents from other types of homicides committed by adolescents and also from parricides committed by adults. In turn, questions have been raised about antecedent maltreatment that may have occurred and its possible role in adolescent violence. This article offers an alternative hypothesis to the PTSD-related approach to trauma by emphasizing key roles played by the chronic shame and humiliation suffered as a consequence of maltreatment. Such an explanation raises legal questions that are different from those raised in the PTSD approach.

## Diverse Case Illustrations

### Case 1

A 17-year-old male living with his widowed father devised a plan with a friend to shoot his father. Mixed motives were described involving revenge and financial gain. The friend rang the doorbell, and the father was shot from behind while his son was standing on the steps behind him. There was no history of abuse, and a BCS defense was not allowed at trial. An appellate court affirmed a first-degree murder conviction while holding that expert evidence about BCS was to be admitted only under the regular rules of criminal procedure and that the *Frye* test for scientific admissibility did not apply to behavioral science.[7]

### Case 2

A 16-year-old school dropout shot his divorced mother who had been giving him money for marijuana but had recently refused to continue to do so. When he was younger, she had beaten him with a belt, and when he reached age 16, they fought physically. When she refused him money, he shot her while she was in bed and took money to buy marijuana. In the morning, he returned home as though nothing had happened. A BCS defense was raised.

### Case 3

A 16-year-old shot his father after his parents returned from dining. Self-defense was raised on the basis of beatings he had received since age two. After a jury verdict of voluntary manslaughter was reached, an appeal was raised about the exclusion of psychiatric testimony on BCS, where a psychiatrist would have testified that the boy feared serious bodily injury or loss of life. The appeal was denied on the basis that the criteria for the admissibility of expert testimony had not been met. There had not been an offer of proof that the pertinent art of scientific knowledge permitted a reasonable expert opinion as part of self-defense.[8]

### Case 4

A 17-year-old shot his stepfather, who was returning from work. The trial court denied expert testimony on BCS but an appellate court held that, to evaluate the imminence of danger, the court or jury could use a subjective standard to assess the reasonableness of the defendant's perception of imminent danger in relation to acting in self-defense. The court concluded, "For that reason, the rationale underlying the admissibility of testimony regarding the battered woman syndrome is at least as compelling, if not more so, when applied to children."[9] The helplessness of the boy was juxtaposed to a battered woman who could not escape.

### Case 5

A 16-year-old shot his mother five times in the head and neck with a bow and arrow and testified that she had been abusive to him for years.[10] When drinking the night before, she had thrown a beer can at him that cut his lip. He locked himself in his room while she threatened to "beat his face in." Later, while his mother was lying on a couch, he shot her. Psychological testimony about the effects of long-term child abuse was not allowed. The Ohio Supreme Court later held that there was sufficient evidence for an expert to testify regarding BCS as it related to self-defense, stating that ". . .the behavioral and psychological effects of prolonged child abuse on the child have been generally accepted in the medical and psychiatric communities and therefore unquestionably meet the requisite level of reliability for admission as the subject of expert testimony."

## Case 6

An occasional case involving psychosis arises. A 15-year-old boy had contemplated killing his father for months, while feeling ashamed of "evil thoughts" centered on mutilation, which he believed his father had inserted into his mind. During one sleepless night, he decided that he could "take it no more." He waited at the end of the driveway where he knew his father would exit in the morning and shot him. No insanity defense was entered but rather self-defense based on child abuse, which was mounted in hopes of avoiding a prolonged psychiatric hospitalization.

## The Question of Past Maltreatment

A clinical approach seeks diagnoses that suggest reasons for a homicide. A developmental approach adds a maltreatment component. The difficulty is that the search for a motive may use an erroneous single-factor model, while a host of relevant variables are usually in play.[11] Multiple individual and familial antecedents may be relevant in adolescent parricides, such as impulsivity, low attainment, parental psychopathology, maltreatment in the parents' own background, impaired attachments, mood instability, or some neurobiological vulnerability. Yet, risk factors, just as with variables for criminal offending, do not necessarily produce a psychiatric disorder. While these variables may cause vulnerability in an adolescent, the reality is that the majority of documented maltreated adolescents do not commit a homicide.

Maladaptation is a complex interaction between individuals and their internal and external situations.[12] It involves cognitive, socioemotional, linguistic, representational, genetic, and neurobiological processes.[13] This spectrum offers insights into understanding certain psychopathologies, but it lacks specificity for a future parricide. Legal issues arise in this uncertainty: is the killing an act of self-defense, is some significant degree of excuse present, or is it simply another case of juvenile homicide? BCS as a legal defense requires a specific connection to the killing. PTSD is frequently raised as the bridge. Sometimes a diagnosis of depression is offered, but the presence of depression does not as readily suggest a preceding trauma.

Three problems arise if maltreatment is relied on as the key variable: the overwhelming number of abused adolescents do not commit a parricide, PTSD does not have an inevitable outcome of violence,[14]

and most adolescent parricides are nonconfrontational. The hypothesis is then extended to an adolescent's belief that he or she is living in a milieu of imminent bodily harm and can survive only by carrying out a preemptive strike.

When psychiatrists follow the PTSD path, they may have left their clinical moorings and slipped into a legal stance. A clinical condition has been injected to get to a legal conclusion in an attempt to avoid a conviction for first-degree murder. A state of learned helplessness or hypervigilance related to PTSD is posed as the reason for the parricide. As noted, the adolescent may occasionally be delusional, but for the majority, an inquiry into the thinking of the adolescent and the family's interactions reveals diverse antecedents.

A reverse question may be raised as to why more maltreated adolescents do not commit parricides. Even with the false hypothesis that most abused adolescents develop PTSD, the actuality remains that they do not commit homicide. A longitudinal study of those exposed to trauma, with a follow-up extending for 15 years after first grade, found that only 8.8 percent developed PTSD.[15] Similarly, a community-based study found PTSD in less than 10 percent.[16] In a longitudinal study assessing multiple traumatic events, 1420 children at ages 9, 11, and 13 were followed through to 16 years of age.[17] Two categories were considered: being a victim of physical abuse or being a victim of psychological abuse by a relative. The prevalence rates were 3.1 percent and 7.2 percent, respectively, with 13.0 percent and 13.5 percent having a lifetime painful recall. While two thirds of the children in the study were victims of trauma before their 16th birthdays, less than 0.5 percent developed PTSD.

Neurobiological sequelae in the developing brain as a consequence of physical or psychological maltreatment raise similar problems. Research has focused on the effects of maltreatment on the limbic-hypothalamic-pituitary-adrenal axis, with possible impact on developing brain structures.[18] Studies on the developmental neurobiology of stress show underarousal in disruptive behavior disorders and low cortisol levels, whereas anxiety disorders and depression reflect an exaggeration of normal anticipatory hormonal responses. Neurobiological research should be conducted to consider the various types, severity, and duration, as well as environmental factors and resiliency of the individual. Much of the

work in PTSD has focused on adult glucocorticoid alterations or corticotrophin-releasing hormone. Genetic factors may influence the stress response system and the 5-HT neurotransmitter system. The hypothesis is that early exposure to adversity contributes to emotional detachment, and subsequent difficulty in learning from punishment predisposes toward severe and persistent antisocial behavior.[19] Yet, even in such research, most maltreated children do not exhibit such neurophysiological findings, perhaps because neglect encompasses multiple factors.

Adolescents have only a gradual emergence of cognitive capacities in the prefrontal cortex, which controls inhibition and emotional self-control and thus modulates risk-taking and novelty-seeking.[20] While these findings indicate that adolescents may be more vulnerable, they raise the general question of whether, as a class, adolescents should be assessed legally as less blameworthy than adults.[21] Still left open is the search for particulars as to why an individual adolescent commits a parricide, whatever the neurophysiological findings.

## The Analogy of BWS to BCS

BCS was developed as a legal defense by extension of the reasoning used in BWS. One role for a psychiatrist might be as an advocate for such an approach.[22] However, arguing a social cause does not resolve the question of legal responsibility for acts of killing. Psychiatric explanations are often insufficient when we try to go beyond the effects of maltreatment on the interactions and mentalizations of the adolescent.

The baseline for BCS and BWS is that battering anyone is unacceptable, more so if the victim is a child or woman. If a foundation for battering has been laid, typical self-defense questions arise such as: how much time elapsed from the last beating to the homicide? How relevant to self-defense is the elapsed time? Is it necessary to believe that death or serious bodily harm is imminent? Does a reasonable belief that such harm would occur suffice? Should the rule be limited only to a proportional amount of force being used? Is it necessary that the accused not initiate the aggression? If a court allows expert psychiatric testimony, the goal is to show that the killing was either justifiable by self-defense or to raise an explanation that mitigates first-degree murder.

A defense of BCS has emerged in adolescent parricides in some jurisdictions, either by legislative enactments or appellate decisions that allow expert tes-

timony. In Maryland, legislation allows BWS testimony but makes no reference to children. When a case of adolescent parricide arose, the court extended the statute to children without any airing of the issue.[23] The argument is that if a BCS defense is not allowed, adolescent parricides are handled like other cases of homicide.

Questions of scientific credibility give rise to *Frye*/ *Daubert* hearings. When BCS was raised as a novel defense, one state supreme court simply held that clinical assessments were social science evidence and did not require such scrutiny.[7] However, the U.S. Supreme Court in a case subsequent to *Daubert*, held that the test applies not just to scientific expertise, but also to technical and specialized knowledge.[24] Testimony is admissible only if based on sufficient facts or data, if it is the product of reliable principles and methods, and if the expert has reliably applied the scientific principles and methods to the facts of the case.

If a court allows BCS testimony, there is the inference that it has accepted the analogy to BWS. However, the analogy requires thorough exploration legally and clinically. Such an analogy is not self-evident, although appellate courts may be unquestioning as in stating, "The underpinnings of that application, we believe, have been generally accepted in the psychological and legal communities and are therefore reliable."[23]

## Dilemmas in Adolescent Parricides

Adolescents who commit parricide usually have four legal options: plead guilty, plead not guilty by reason of insanity, offer an excuse to mitigate the degree of the homicide verdict, or argue that the act was justifiable as self-defense. Self-defense usually requires that the threat to life be "imminent" and that the adolescent meet a reasonable-person requirement that a force sufficient to kill the parent was needed to save his or her own life. Meeting these criteria is difficult, especially when the encounter was nonconfrontational.

Battered women were viewed as trapped because they fear more violence if they leave or are viewed as too dependent to leave. Such fears of leaving and the presence of dependency may seem similar for adolescents, yet the pattern of violence with an adolescent differs from that in BWS. In women, repetitive cycles of accumulating tension, leading to battering incidents with explosive rage and subsequent states of

contrition and reuniting, are typical abusive patterns.[25] Outbursts against adolescents do not fit such a cycle and are less frequently fueled by alcohol.

Rather than a contrite restoration, the pattern with adolescents fits a theoretical model of an accumulated sense of humiliation and shame. The pattern witnessed in women is battering leading to PTSD with helplessness and hypervigilance. In contrast, the pattern witnessed in adolescents is an accumulation of unresolved affective components. Maltreatment, perceived as undeserved, thus elicits shame and a sense in adolescents that they are not worthy of respect.

While the hypervigilance postulated for women may occur in abused adolescents, a smoldering resentment is more likely. The calm exterior often described before and after a parental killing puzzles investigators, attorneys, and clinicians. It is as though a necessary act has been performed. Although the idea of their being killed in an undeserved beating may occur to them, adolescents generally continue to live in a state of unresolved tension with the derivatives of shame.

Flimsy and superficial plans may have been laid by the adolescent, and he may have told friends that he wanted to kill a parent. Peers rarely believe that such talk is serious, but occasionally they become accomplices because they did not report the threats. One of the more painful aspects is dealing with the parents of such accomplices who are also facing murder charges for their roles.

The lack of long-range planning by the perpetrator is striking. The adolescent may simply get in the parents' car and drive away without any thought of where he is going. Older adolescents may think of going to another part of the country or world to start over. A common pattern is assuming that the police will think someone else committed the acts. Some believe they will receive an inheritance from the deceased parent. One adolescent who had shot his parent drove away repeating the words of Martin Luther King, "Free at last. Thank God almighty. Free at last." To him, the act seemed a reasonable solution. Such thinking suggests a dissociation originating with responses to earlier episodes of maltreatment. It is as though the homicide is carried out by someone who is "not me."[26] Adolescent parricides elicit ambivalence—sympathy for the adolescent, mixed with questions of responsibility. Is the act one of self-

defense or a defiant escape from an existence in which the perpetrator was seemingly trapped?

These hypotheses often elicit the following challenge: it is all well and good for psychiatrists to offer diverse explanations for adolescent parricides, but a legal system is concerned about justice and whether there are sufficient circumstances to mitigate a murder conviction. Therefore, diverse clinical formulations are interesting, but may not be sufficient in a courtroom unless there is an explicit mental disorder. However, an attorney who has represented many battered women at trial does not see self-defense as so confining.[27] There are other types of defense, such as duress.[28] The duress argument is that continuing threats and humiliation lead the adolescent to believe that death is imminent and the only way to avoid it is to engage in behavior that, in a literal sense, violates criminal law. Duress can be seen as the reason that an adolescent ultimately overcomes his moral controls and engages in homicidal behavior.

Further, an imminent need for self-defense need not mean an immediate threat to one's life, but that one is living in a state of not knowing when his or her life may be in danger. In that sense, killing may be a reasonable act for an adolescent who lives in an uncertain state of maltreatment and feels helpless, with unremitting shame. Objectivity regarding any such defense requires a thorough forensic examination that elicits details about the adolescent's specific situation, the relative size and strength of the parties, emotional and physical disabilities, and ongoing acts and threats of violence.[29]

Many parricides are, in part, a protest against continuing humiliation. To assert that an adolescent is a helpless creature and has lost the capacity to make choices extends the justification of impaired mental functioning beyond what can clinically be confirmed.[30] It is not that abused adolescents have lost the capacity to choose, but rather that they have opted to escape what they perceive as being trapped in a situation in which an abuser can periodically attack them. Emotions and mindset are crucial, since they lay the groundwork for a homicide. The focus then shifts from how bad or evil a parental abuser may have been *per se* to an unraveling of what developed in the emotions and thinking of the adolescent.

Adolescent parricides reveal that community intervention either has not worked or has not been available. When the endpoint is reached, the adolescent concludes that only two options are left: main-

tain the *status quo* of living in humiliation or take action. The action is not necessarily to escape immediate life-threatening harm but to stop the degradation in their lives, which they see as unending. According to their thinking, they are making a reasonable attempt at survival and no longer having to hide from humanity.[31]

## Hypotheses Regarding Adolescent Parricide

Rather than PTSD's being the key element in adolescent parricide, the hypothesis is raised that shaming and its reflection on the self as good or bad are central.[32,33] The psychopathology of shame elicits humiliation in contrast to guilt.[34] The resultant self-assessment is that of being small and powerless.[35] Even trivial incidents may induce shame that the individual has trouble acknowledging. A similar disproportion has been witnessed in studies of exaggerated acts of violence by prisoners or mentally disordered offenders.[36] Adolescents who commit a parricide may analogize their situation to a suicide.[37] Disappointments in not meeting standards leave them feeling deficient with a need to deal with self-contempt. Suicide is one way out, parricide another. Initially, there may be a dysphoric state. When aversiveness shifts from the self to the abusive parent, the shift is from suicide to parricide.

In the young, shame-induced fantasies instigate vengeful states of mind.[38] Repeated humiliations accumulate and contribute to a need for vengeance. When the person reaches adolescence, the increase in aggression presents more options. Fantasies of revenge give an illusion of strength in contrast to helplessness.[39] Vindictiveness is seen as justified.[40] It is desirable for the psychiatrist to try to understand what brought matters to such a point of finality, what defenses held it in check up to that point, and how a state of vengefulness translates into action, whatever the consequences. By then, matters have progressed beyond forgiveness.

The humiliated adolescent who becomes preoccupied with vengefulness senses an option for a relief of dysphoric feelings. However, there is also a means of overcoming a state of powerlessness by a sense of power. Rather than reflecting on the consequences of an act, there is an ego-syntonic sense of achieving justice. Pursuing justice thus has a moral theme, not only that the potential victim has it coming, but that future shameful humiliations will end. The result is a

compromised view of reality. The act is justified by the belief that the humiliation will not end otherwise. The adolescent feels entitled to administer not only a proportionate punishment but a final solution to the problem. The result is a failure in moral regulation.

There is also the recurrent question of why simply humiliating a parent would not suffice. The answer contains a partial explanation of why most of those who are abused do not kill. For the minority who do kill, repeated humiliations cause them to feel emotionally destroyed, left in a limbo of continued abuse and humiliation. Once the belief has become fixed that nothing will change, the need to take action becomes more compelling. Not to carry out the killing, but to do something less, leaves the individual with a sense of unrelieved shame and powerlessness and no assurance that the problem will be resolved. The solution is a breakthrough of murderous rage accompanied by a feeling of moral justification. The dehumanized abuser must be destroyed. Evaluations of these individuals after a parricide show a relative calm with a seemingly incomprehensible absence of remorse.

## Conclusion

Adolescent parricides do not usually show the clinical signs and symptoms of a psychotic disorder, in contrast to adult parricidal acts. Further, the non-confrontational nature of many adolescent parricides makes arguing self-defense difficult, although not impossible if an expanded view of being in imminent danger is allowed. A proposed alternative conceptual model stresses the relationship of enduring patterns of shame to a parricide that can fit in with a legal view of duress in response to perceived chronic humiliation. The focus then shifts to the roles of shame and rage rather than a PTSD outcome as seen in BWS.

When asked subsequent to a parricide whether they were aware of feeling shamed by a parent, most adolescents reply in terms of anger, resentment, or a feeling of injustice. Scheff and Retzinger[41] noted how unacknowledged shame quickly changes into rage. In the shame-rage cycle, shame is an unconscious process that instigates violent behavior, in contrast to an overt and conscious experience of shame.[42] The stage is set by a painful state of disgrace, feeling mocked, or feeling rejected. Better to rid the self of such ruminations by rendering the abuser powerless. To paraphrase the individual's mental state, "Even if I die in the attempt to rid

Malmquist

myself of my abuser, it is better than continuing the *status quo*." In fact, a vicarious killing of the self can be followed by long periods of incapacitation, which sabotage the person's life. In the compelling need to act, assessments of the consequences of the behavior are ignored. The incapacity to forgive the abuser, with the unresolved sense of shame and humiliation, ultimately is a response to a narcissistic wound. The injury and sense of injustice overcome moral controls and drive the parricide, a final act of narcissistic rage.

## References

1. Hillbrand H, Alexandre JW, Young JO, et al: Parricides: characteristics of offenders and victims, legal factors, and treatment issues. Aggress Violent Behav 4:179–90, 1999
2. American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision. Washington, DC: American Psychiatric Association, 2000
3. Heide KM, Petee TA: Parricide/an empirical analysis of 24 years of US data. J Interpers Violence 22:1382–99, 2007
4. Heidi KM, Petee TA: Weapons used by juveniles and adult offenders in US parricide cases. J Interpers Violence 22:1400–14, 2007
5. Bourget D, Gagné P, Labelle M: Parricide: a comparative study of matricide versus patricide. J Am Acad Psychiatry Law 35:306–12, 2007
6. Hillbrand M, Cipriano T: Commentary: parricides—unanswered questions, methodological obstacles, and legal considerations. J Am Acad Psychiatry Law 35:313–16, 2007
7. State v. MacLennan, 702 N.W.2d 219 (Minn. 2005)
8. Jahnke v. State, 682 P.2d 991 (Wyo. 1984)
9. State v. Janes, 822 P.2d 1238 (Wash. Ct. App. 1992)
10. State v. Nemeth, 694 N.E.2d 1332 (Ohio 1998)
11. Cicchetti D, Toth SL: Child maltreatment. Ann Rev Clin Psychol 1:409–38, 2005
12. Sameroff AJ: Developmental systems and psychopathology. Dev Psychopathol 12:297–312, 2000
13. Cicchetti D, Dawson G: Multiple levels of analysis. Dev Psychopathol 14:417–66, 2002
14. National Research Council: Understanding Child Abuse and Neglect. Washington, DC: National Academy Press, 1993
15. Storr CL, Ialongo NS, Anthony JC, et al: Childhood antecedents of exposure to traumatic events and posttraumatic stress disorder. Am J Psychiatry 164:119–25, 2007
16. Kessler RC, Sonnega A, Bromet E, et al: Posttraumatic stress disorder in the National Comorbidity Survey. Arch Gen Psychiatry 52:1048–60, 1994
17. Copeland WE, Keeler G, Angold A, et al: Traumatic events and posttraumatic stress in childhood. Arch Gen Psychiatry 64:577–84, 2007
18. Gunnar MR, Vazquez D: Stress neurobiology and developmental psychopathology, in Developmental Psychopathology (ed 2). Edited by Cicchetti D, Cohen DJ. New York: John Wiley & Sons, 2006, pp 533–77
19. vam Goozen SHM, Fairchild G, Snoek H, et al: The evidence for a neurobiological model of childhood antisocial behavior. Psych Bull 133:149–82, 2007
20. Spear LL: The developing brain and adolescent-typical behavior patterns, in Adolescent Psychopathology and the Developing Brain. Edited by Romer D, Walker EF. New York: Oxford University Press, 2007, pp 9–30
21. Heide KM, Solomon EP: Biology, childhood trauma, and murder: rethinking justice. Int J Law Psychiatry 29:220–33, 2006
22. Chancer LS: High-Profile Crimes: When Legal Cases Become Social Causes. Chicago: University of Chicago Press, 2005
23. State v. Smullen, 844 A.2d 429 (Md. 2004)
24. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999)
25. Walker L: The Battered Woman Syndrome. New York: Springer, 1984
26. Stein A: Prologue to Violence. Mahwah, NJ: The Analytic Press, 2007
27. Maguigan H: Battered women and self-defense: myths and misconceptions in current reform proposals. Univ Penn L Rev 140: 379–486, 1991
28. Dressler J: Battered women and sleeping abusers: some reflections. Ohio State J Crim Law 3:457–71, 2006
29. Krause JH: Distorted reflections of battered women who kill: a response to Professor Dressler. Ohio State J Crim Law 4:555–72, 2007
30. Seligman M: Helplessness: On Depression, Development, and Death. New York: WH Freeman, 1975
31. Nussbaum MC: Hiding from Humanity: Disgust, Shame, and the Law. Princeton, NJ: Princeton University Press, 2004
32. Lewis HBL: Shame and Guilt in Neurosis. New York: International University Press, 1971
33. Tangney JP, Dearing R: Shame and Guilt. New York: Guilford, 2003
34. Wilson JP, Drozdek B, Turkovic S: Posttraumatic shame and guilt. Trauma Violence Abuse 7:122–41, 2007
35. Tangney JP, Stuewig J, Mashek DJ: Moral emotions and moral behavior. Ann Rev Psychol 58:345–72, 2007
36. Gilligan J: Violence: Our Deadly Epidemic and Its Causes. New York: GP Putnam, 1996
37. Dutton DG, Yamini S: Adolescent parricide: an integration of social cognitive theory and clinical views of projective-introjective cycling. Am J Orthopsychiatry 65:39–47, 1995
38. Lansky M: The impossibility of forgiveness: shame fantasies as instigators of vengefulness in Euripides' Medea. J Am Psychoanal Assoc 53:437–64, 2005
39. Horowitz MJ: Understanding and ameliorating revenge fantasies in psychotherapy. Am J Psychiatry 164:24–7, 2007
40. Horney K: The value of vindictiveness. Am J Psychoanal 8:3–12, 1948
41. Scheff T, Retzinger S: Helen Block Lewis on shame: appreciation and critique, in The Widening Scope of Shame. Edited by Lansky MR, Morrison AP. Hillsdale, NJ: The Analytic Press, 1997, pp 139–54
42. Lansky M: Unbearable shame, splitting, and forgiveness in the resolution of vengefulness. J Am Psychoanal Assoc 55:571–93, 2007



2

Attachment 2



Attachment   3

Alvin Community College
3110 Mustang Road
Alvin, TX 77511-4898

**Final Grade Report**

Student:   Austin D. Eversole

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

| COURSE SECTION | COURSE TITLE | GRADE | CREDITS | INSTRUCTOR |
|---|---|---|---|---|
| ARTS-1301-96 | Art Appreciation | B | 3.00 | Jeffrey D. Richey |
| BCIS-1305-96 | Business Computer Ap | A | 3.00 | Thomas Cook |
| BIOL-1309-96 | Contemporary Biology | F | 3.00 | Billy J. Sowa |
| HIST-1301-96 | The United States to | A | 3.00 | Barbara K. Janik |
| SCWK-1313-96 | Introduction to Soci | A | 3.00 | Tammi B. Kirby |

| PRIOR | | | CURRENT | | | CUMMALATIVE | | |
|---|---|---|---|---|---|---|---|---|
| ATTEMPTS | COMPLETED | GPA | ATTEMPTS | COMPLETED | GPA | ATTEMPTS | COMPLETED | GPA |
| 0.0 | 0.0 | 0.0 | 15.0 | 12.0 | 3.0 | 15.0 | 12.0 | 3.00 |

| | |
|---|---|
| A | Excellent - Four grade points per credit |
| B | Good - Three grade points per credit |
| C | Average - Two grade points per credit |
| D | Poor - One grade points per credit |
| F | Failure - Zero grade points |
| S | Satisfactory -  No grade point credit |
| R | Re-enroll - No credit |
| U | Unsatisfactory - No grade point credit |
| W | Withdrawal by the published deadline |
| I | Incomplete - No Credit |
| IP | Course in progress |
| AU | Audit  - No credit |
| WE | Withdrawal with exception |

Attachment   4

# The Battered Child Syndrome

SIDNEY J. SUSSMAN, M.D., *San Francisco*

■ *This is a report of socio-medical aspects of 23 episodes of physical abuse among 21 children, and findings include one death, a predominant age below two years, no unusual race or sex distribution, a high incidence of head trauma, skin lesions and bone changes, with a common history of previous abuse in the patient and siblings. Intact families had few children in the house. Parents were usually young, had a high incidence of illegitimate births, mental disease and previous criminal records. Abuse was often inflicted by a close relative, usually the mother.*

*Incidence and severity of physical abuse in California and participation in therapy are discussed.*

EPIDEMIOLOGIC PROJECTIONS by Gil[1] suggested that in 1967 California would lead the nation in incidence of physically-abused children. His discovery of 1,300 cases in California for that year would indicate that this socio-medical disease reached epidemic proportions.[2]

The early literature with its emphasis on clinical manifestations provided clinicians with important diagnostic information,[3-7] but beyond diagnosis lies therapy and prevention of future episodes. Significant accomplishments in these areas are linked to a more thorough understanding of the socio-medical aspects of the battered child syndrome.

It is the purpose of this report to focus on these findings and their severity, based on our experience in San Francisco.

## Material

This study of 23 separate incidents involves 21 physically-abused children from 18 families who were seen between May 1966 and June 1967 as part of a collaborative program between the San Francisco General Hospital, Division of Social Services, and Juvenile Court of the City and County of San Francisco.

Ten families were receiving public assistance, six had incomes between $4,600 and $10,800 a year, and in two instances the income was unknown. While the study group included a predominance of families in poverty, six had incomes that were commensurate with middle class families in the community.

## Results

Most of the abused children were quite young. The majority were less than three years of age when the physical abuse was brought to the attention of the community, but this did not preclude abuse at a younger age. In the group were 15 Caucasians and six Negroes. Distribution of the sexes was about equal (Table 1).

Generally, the families were small; the majority had one or two children in the home. Of nine children born out of wedlock six remained illegitimate and three were legitimized by marriage. Fourteen

From the Department of Pediatrics, University of California-San Francisco Medical Center, and San Francisco General Hospital, San Francisco.

This study was supported by funds from the California State Department of Social Welfare.

Submitted 23 February 1968.

Reprint requests to: Department of Pediatrics, San Francisco General Hospital, 22nd Street and Potrero Avenue, San Francisco 94110.

families were intact, with a father or father figure in the home. Most of the parents were between the ages of 16 and 25 years, with a small age differential between parents; and, with only one exception, the father was always older than the mother. Mental disease (chronic brain syndrome, paranoid schizophrenia, neurotic tendencies and extreme immaturity) was found in one or both adults in nine families. In 12 families, one or both adults had previous criminal records. Marital discord, financial stress, child neglect, impulsive behavior, reversal role of parents, strict disciplinary action, parents from similar backgrounds, sexual promiscuity and provoked incidents by children were present sporadically in varying degrees (Table 1).

Head trauma was the most common finding (15 without obvious central nervous system damage, two subdural hematomas, one concussion, one skull fracture). Ecchymosis, abrasions or scars were present in 13, lacerations in two, and burns in two, and bone changes in nine of 18 children surveyed; and one had cardiac damage. Of the recorded weights in 18 children, three were under the 3 percentile. From hematocrit levels in 16 cases, anemia was noted in four. One two-year-old Indian female was brutally beaten to death. Noted at autopsy were a subdural hematoma, traumatic fracture of first lumbar vertebrae with epidural hemorrhage of spinal canal, traumatic laceration of liver, retro- and intra-peritoneal hemorrhage, contusions, lacerations, acute pulmonary edema, congestion and hemorrhage. In all cases, the patient was proven or surmised to have been abused by a close family member, often the mother. The person who perpetrated the abuse usually brought the child to the hospital or a private physician for medical care (Table 2).

In most cases there was some evidence of previous physical abuse. In six of ten families with more than one child, other children were physically abused (Table 2).

## Discussion

While recent mortality figures are not available, our experience suggests that child battery may be one of the more common causes of death among children in California. In the last six months of 1967 the mortality rate among newly identified cases in our program increased to 12 percent.[8] It has been speculated that mortality from physical abuse may be more common than death from leukemia, cystic fibrosis or muscular dystrophy.[9] Potential and real damage in this condition is clearly illustrated in this series; beatings around the head were commonplace. Additionally, many of the children had significant bone trauma and two had internal injuries. Some children were assaulted on numerous occasions and siblings also suffered attacks. The severity is compounded by the repetitive exacerbations of this disease.[4,10,11]

An elaboration of socio-medical findings provides an indispensable insight into appropriate

**TABLE 1.—Psycho-social characteristics of abused children and their families**

| Age of children (yr.) | Children | | |
|---|---|---|---|
| | Male | Female | Total |
| <2 | | | 9 |
| 2-3 | | | 5 |
| 3-5 | | | 4 |
| >5 | | | 3 |
| Race: | | | |
| Caucasian | 8 | 7 | 15 |
| Negro | 3 | 3 | 6 |
| No. in home | | | |
| 1 | | | 8 |
| 2 | | | 3 |
| 3 | | | 4 |
| 4 | | | 3 |
| Children born out of wedlock | | | 9 |
| Remained illegitimate | | | 6 |
| Legitimized by marriage | | | 3 |
| PARENTS: | | Mother | Father Father Figure |
| In home | | 18 | 14 |
| Age: (yr.) | | | |
| 16-20 | | 6 | 5 |
| 21-25 | | 6 | 2 |
| 26-30 | | 3 | 3 |
| >30 | | 3 | 4 |
| Mental Disease Present | | 7 | 5 |
| Previous criminal record | | 7 | 11 |

**TABLE 2.—Characteristics related to child battery**

| Clinical findings: | | No. |
|---|---|---|
| Head trauma | | 19 |
| Skin lesions | | 17 |
| Bone pathology | | 9 |
| Death | | 1 |
| Perpetrator of abuse: | Proven | Suspect |
| Mother | 8 | 6 |
| Father | 5 | 2 |
| Mother and father | — | 1 |
| Grandmother | 1 | — |
| Perpetrator who takes patient for care: | | |
| Mother | | 6 |
| Father | | 4 |
| Previous abuse | | |
| Study patients | | 15 |
| Siblings | | 6 |

therapy. Several common characteristics have emerged from our study. At the time of diagnosis, the family unit usually consisted of a young mother, a slightly older father or father figure, and one or two children. The seeming tendency toward small families may not be characteristic, since siblings in six families were in voluntary or court-ordered placement. Illegitimate births were common among abused children and occasionally led to forced marriage. While families were intact, they rarely functioned well as cohesive units, and harmony was disrupted by a multitude of stresses, including mental disease, criminality, impulsive behavior, marital discord, promiscuity and financial insecurity.

Skin lesions were the only findings in most patients. However trauma to multiple areas—head, skin, bones, and/or internal organs—was quite common. Short stature and anemia, findings noted by other investigators,[12] were observed in a few patients.

Current emphasis in management is linked to mandatory reporting laws in all the States, District of Columbia, Guam and the Virgin Islands. Unfortunately, many physicians have withdrawn from cases after fulfilling the legal obligation of reporting. It seems inappropriate to divorce diagnosis from therapy—the former handled principally by physicians and the latter by jurists. No one has willfully excluded physicians from therapeutic schemes. Quite the contrary, jurists and others welcome physician participation in social planning.[8] In court, the physician can strongly influence the ultimate decision through written opinions and testimony. Judges, referees, and probation officers view the medical profession as an untapped resource for referral of battered children.[8] It seems appropriate to accept this challenge particularly

in view of current incidence and mortality figures. The socio-medical data presented here and elsewhere[5,13-18] provide a basic understanding upon which one can build therapeutic programs.

### REFERENCES

1. Gil, D. G.: Nationwide Epidemiologic Study of Child Abuse, Paper presented at the National Conference of Social Welfare, Chicago, Ill., June 1966.

2. Brimlow, M.: Unpublished data, 1967.

3. Caffey, J.: Multiple fractures in the long bones of infants suffering from chronic subdural hematoma, Amer. J. Roentgen., 56:163-173, 1946.

4. Gwinn, J. L., Lewin, K. W., and Peterson, H. G., Jr.: Roentgenographic manifestations of unsuspected trauma in infancy, JAMA, 176:926-929, 1961.

5. Kempe, C. H., Silverman, F. N., Steele, B. F., Droegemueller, W., and Silver, H. K.: The battered-child syndrome, JAMA, 181:17-24, 1962.

6. Silverman, F. N.: The roentgen manifestations of unrecognized skeletal trauma in infants, Amer. J. Roentgen., 69:413-427, 1953.

7. Woolley, P. V., Jr., and Evans, W. A., Jr.: Significance of skeletal lesions in infants resembling those of traumatic origin, JAMA, 158:539-543, 1955.

8. Sussman, S. J.: Unpublished data, 1967.

9. Fontana, V. J.: The Maltreated Child; The Maltreatment Syndrome in Children, published by Charles C Thomas, Springfield, Ill., 1964.

10. Boardman, H. E.: A project to rescue children from inflicted injuries, Social Work, 7:43, 1962.

11. Elmer, E.: Identification of abused children, Children, 10:180-184, 1963.

12. McHenry, T., Girdany, B. R., and Elmer E.: Unsuspected trauma with multiple skeletal injuries during infancy and childhood, Pediatrics, 31:903-908, 1963.

13. Cohen, M. I., Raphling, D. L., and Green, P. E.: Psychologic aspects of the maltreatment syndrome of childhood, J. Pediat., 69:279-284, 1966.

14. Elmer, E.: Children in Jeopardy, University of Pittsburgh Press, Pittsburgh, Pennsylvania, 1967.

15. Morris, M. G., Gould, R. W., and Matthews, P. J.: Toward prevention of child abuse, Children, 11:55-60, 1964.

16. Nomura, F. M.: The battered child "Syndrome," A Review, Hawaii Med. J., 25:387-394, 1966.

17. Nurse, S. M.: Familial patterns of parents who abuse their children, Smith College Studies in Social Work, 35:11, 1964.

18. Zalba, S. R.: The abused child. II. A typology for classification and treatment, Social Work, Jan. 1967.



Attachment  5

Reprinted with permission of Sage Publications (Thousand Oaks, CA.)

# Evidence of Child Maltreatment Among Adolescent Parricide Offenders

Kathleen M. Heide

*Abstract: Beginning in the 1980s, a series of popular accounts of adolescents who killed parents indicated that these youths were victims of child maltreatment. In this article, definitions of specific types of abuse and neglect are presented. The incidence of these forms of childhood maltreatment among the author's sample of adolescent parricide offenders (APOs) is reported. Thereafter, evidence of child abuse is investigated across the ten previously published studies of APOs appearing in the professional literature from 1941 through 1984. Results revealed that various forms of child abuse and neglect were evident in others' reports, although not necessarily identified by them as such. These findings provide additional confirmation that understanding the phenomenon of child maltreatment is critical in unraveling the dynamics leading to the slaying of a parent. The results underscore the need for education about the parameters of abuse and neglect.*

A series of journalistic and literary accounts of youths killing their parents has generated enormous public interest in recent years (e.g., Blais, 1985; Kleiman, 1988; Leyton, 1990; McGinnis, 1991; Mones, 1991; Morris, 1985; Prendergast, 1983; 1986; Rosenthal, 1985; Walker, 1989). In the popular literature, adolescents who have killed parents have typically been portrayed as victims of child abuse.

These accounts suggest that understanding the parameters of child maltreatment is critical in unraveling the dynamics that propel some adolescents to kill their parents. In defining child maltreatment, the law distinguishes between crimes of commission and omission. Acts committed upon a child that are harmful constitute abuse; failure to act that results in harm to the child constitutes neglect.

I find it clinically useful to distinguish among four types of abuse (physical, sexual, verbal, and psychological) and three types of neglect (physical, medical, and emotional). "Emotional incest," a term introduced by Ackerman (1986) and referred to by Bradshaw (1988, 1990) as emotional sexual abuse, often accompanies emotional neglect. Not surprisingly, one type of child maltreatment can lead to the other. Children who are physically or sexually abused by their parents become victims of neglect when their parents fail to seek medical attention for resulting injuries or sexually transmitted diseases.

Following the delineation of my definitions of the specific types of

*Article prepared for the 44th Annual Meeting of the American Society of Criminology, held in New Orleans, Louisiana, November 1992.

abuse and neglect, findings from my study of adolescent parricide offenders are presented. Thereafter, studies of adolescents who killed parents that were previously published in the professional literature are examined to determine the presence of these specific forms of child maltreatment. Similarities between my cases and others increase the likelihood that the findings are not peculiar to any state or region.

The types of abuse and neglect defined below are discussed and illustrated further in Heide (1992, 1993).

## TYPES OF CHILD MALTREATMENT

### PHYSICAL ABUSE

Physical abuse includes inflicted physical injury or the attempt to inflict physical injury or pain that is indicative of the unresolved needs of the aggressor inappropriately expressed. This definition captures the dynamics involved in physically abusive conduct by directing attention to both the victim and the offender. It incorporates the concept of cause as well as effect and can be utilized to define physical violence perpetrated on the spouse as well as the child. Thus, it is broad enough to encompass both acts of child physical abuse and spouse abuse.[1]

### SEXUAL ABUSE[2]

I differentiate between two types of parents' sexual abuse of children, overt and covert (Middleton-Moz, 1986), as well as forcible rape. Overt sexual abuse involves a "physical form" of offending and is the more readily identifiable of the two. A parent who sexually fondles a child or who engages in vaginal intercourse, anal sex, or oral sex with a child has sexually abused that child in an overt way. Covert sexual abuse involves exposing a child to sexual issues that are age-inappropriate and/or raising the child in an environment that is sexually saturated and/or provocative (Middleton-Moz, 1986). Although direct sexual contact between parent and child does not occur, parental activities are undeniably sexually explicit.[3] In the United States, for example, a mother who masturbates in front of her son, or a father who shares pornography with his daughter sexually abuses the child covertly.

Overt sexual abuse is conceptually distinct from forcible rape. I use the term overt sexual abuse to depict sexual activities engaged in by the parent with the child that are frequently characterized by physical and emotional gentleness on the part of the parent. The parent who overtly sexually abuses a child generally does not want to hurt the child physically or psychologically. In contrast, the father who sexually assaults his son or daughter

because he is enraged and/or wants to show who is "boss" is no different from an "angry rapist" or "power rapist" (Groth, 1981; Groth & Birnbaum, 1979). The sexual attack serves to vent anger, demonstrate power, and humiliate the victim. Elements are present for a victim in a forcible rape that are often absent in a typical incest encounter: the child feels powerless to resist the assault and is momentarily terrified that she or he may not survive the attack.

### VERBAL ABUSE

Verbal abuse consists of words spoken to a child, or remarks made in the child's presence about the child, that either are designed to cause damage to a child's concept of self or would reasonably be expected to undermine a child's sense of competency and self-esteem. Verbal abuse includes swearing at a child (e.g., "God damn you to hell"), making belittling remarks about the child (e.g., "you are good for nothing"), and blaming the child for the parents' problems (e.g., "you're ruining my marriage").

### PSYCHOLOGICAL ABUSE

Psychological abuse encompasses *words* and *behaviors* that undermine, or that would reasonably be expected to undermine, a child's sense of self, competence, and safety in the world. Verbal abuse is one type of psychological abuse. Physical and sexual abuse are also forms of psychological abuse when they are inflicted by parents or guardians because these acts represent a violation of trust.

Psychologically abusive communications can be extremely complex. These messages are particularly harmful because they often communicate to children that they are not valued for themselves or that they are unable to measure up to their parents' expectations regardless of what they do. Some of the acts committed by parents are undoubtedly cruel (e.g., one father strangled his child's pet as the boy watched; one mother called her son "a son of a bitch" and spat in his face in front of his girlfriend). Other acts appear engineered to humiliate the child into complying with parental expectations that the child may be unable to meet.

### PHYSICAL NEGLECT

Physical neglect occurs when parents fail to provide food, clothing, and a safe home environment for their children. In addition to meeting these physical needs, parents are supposed to supervise their children

adequately. In adolescent parricide cases in which one parent, usually the father, is physically abusive, the nonabusive parent, usually the mother, is legally bound to protect the children from harm.

## MEDICAL NEGLECT

Medical neglect occurs when parents fail to provide appropriate health care for their children, when they have the financial means or other resources to meet them, are neglecting their children's medical needs.

## EMOTIONAL NEGLECT

Emotional neglect occurs when parents fail to respond to their children's emotional needs. Children need to be nurtured, loved, supported, and encouraged to develop a sense of themselves as valuable individuals and to obtain a sense of a basic trust towards others. Children also need parents to listen to them, console them, and help them with their problems.

## EMOTIONAL INCEST

Emotional incest occurs when a parent aligns with a child and relates to that child as though the child were the spouse (Ackerman, 1966). These children nurture the parent, act as the parent's confidant (e.g., discuss adult problems such as sexuality and relationships), and, on occasion, serve as the parent's protector against the other parent.

## SAMPLE OF ADOLESCENT PARRICIDE OFFENDERS

In-depth assessment interviews were conducted with seven adolescents who killed parents. Two were among 59 subjects in a study of adolescent murderers (Heide, 1984). Of the remaining five, four were referred by defense counsel for pretrial evaluation. The remaining case was referred by a state prosecutor strictly for research purposes.

These seven youths were all white and ranged in age from 12 to 17. Six were male. Two of these youths killed both parents. As a group, they killed six fathers, three mothers, and one brother. They each used firearms, which were readily available, to commit the murders.

Six of these youths fit the profile of the severely abused child (Heide, 1992), that is, a youth who in desperation killed his or her parents to end the abuse inflicted by one or both of them. Four of these youths seemed to suffer from post-traumatic stress disorder, and some dissociation around the homicide was apparent in each of these cases. In the remaining two cases, the diagnoses were uncertain. One youth, a 16-year-old boy who killed his father, had been drinking and had taken a Qualude prior to killing

his father. The remaining case involved a 12-year-old boy who killed his mother and her brother. This youth was the only adopted one of the six. Unfortunately, data pertinent to determining whether the dynamics recently identified as the Adopted Child Syndrome (Kirschner, 1992) were operative in this case were not systematically investigated. There was disagreement among the six mental health professionals regarding the appropriate psychiatric diagnosis in this case. All agreed, however, that the boy was not psychotic.

The youth referred by the state prosecutor was one of the two cases in which the youth had killed both of his parents. This adolescent was severely mentally ill. The killing of his parents appeared to have been propelled by the youth's psychosis. Accordingly, the examination of child maltreatment focuses on the six cases in which abuse histories were documented.

Physical abuse was a factor in the five parricide cases in which fathers were slain and often appeared to have been the result of the father's anger and dissatisfaction with his life and marital circumstances. Two fathers, for example, beat their adolescent children more frequently when their common-law wives walked out on them, claiming that the break-up was the children's fault. Although none of the APOs were ever hospitalized as a direct result of physical abuse, they did sustain injuries. In addition to injuries and obvious attempts to hurt, the pervasiveness of the threat of serious injury and even death was readily apparent in these homes. The fathers of three APOs, for example, each threatened to kill their children.

In at least four of the six cases, spouse abuse preceded or coexisted with child physical abuse. These adolescents' histories included the horror of witnessing extreme forms of violence as well as the terror of being victims.

Covert sexual abuse was suggested in one of the five cases involving boys who killed parents; the one girl who killed her father was both covertly sexually abused and forcibly raped by him. Verbal abuse was a common occurrence in each of the six cases in which adolescents killed their parents. Psychologically abusive words and behaviors were present in the six cases of severely abused APOs.

Physical neglect was present in all six cases in which the six severely abused children killed their parents. In one case, the parent with whom the youth was living failed to provide him with food and care while the youth was sick. In two cases, the parents failed to supervise their children adequately due to their alcoholic lifestyles. In three of the four cases in which fathers were the only victims killed by the youth, the mothers, all of whom had been physically and emotionally abused by their husbands, had taken flight and left their child to live alone with their abusive mate. In the fourth case, the mother, who had also been abused by her husband, was hospitalized and could no longer protect her son from his father's wrath. In all six cases, the parents had failed to provide their children with a home in

which they could feel safe from physical and emotional harm by their parents.

Medical neglect was indicated in one of the parricide cases. Donny, who at 16 years of age killed his father, had hepatitis. The father refused to take him for medical care, accusing the boy of faking. Eventually, relatives intervened and were given legal authorization to consent to medical treatment for the youth.

Emotional neglect was present in all six cases in which severely abused children killed their parents. Emotional incest was evident in three of these six cases.

## CHILD MALTREATMENT IN OTHER STUDIES OF ADOLESCENT PARRICIDE OFFENDERS

Frederic Wertham (1941) was the first mental health professional to examine adolescent parricide scientifically. Wertham presented an extensive case analysis of why 15-year-old Gino had taken a bread knife and stabbed his mother 32 times. Less than a dozen case studies specifically addressing the phenomenon of adolescent parricide have appeared in the professional literature since Wertham's case study of Gino published 50 years ago. Eight clinical studies in particular tend to be cited repeatedly as authoritative in his context (Duncan & Duncan, 1971; McCully, 1978; Post, 1982; Russell, 1984; Sadoff, 1971; Sargent, 1962; Scherl & Mack, 1966; Tanay, 1973, 1976). Only one empirical study of adolescent murderers (Corder, Ball, Haizlip, Rollins, & Beaumont, 1976) that specifically compared youths who killed their parents with those who killed another relative/close friend and those who killed strangers exists. Other authors have identified youths who killed family members in their studies or reports of juvenile homicide offenders. Their tendency, however, has been simply to tabulate the relationship between the victims and the offenders (Russell, 1979; Sorrels, 1981) or to note it in the presentation of the case study without making the parricidal nature of the relationship the primary focus of the investigation, analysis, and discussion of the study results (Benedek & Cornell, 1989; Gardiner, 1985; Hellsten & Katila, 1965; Malmquist, 1971; McCarthy, 1978; Myers & Kemph, 1988; Patterson, 1943; Reinhardt, 1970; Russell, 1973, 1979). Given the small sample sizes in these studies, the authors could not analyze parricide cases separately from other types of homicides and had to combine all cases in the analysis and discussion sections of the article or book.

Evidence of specific forms of child abuse and neglect across the previously published studies that specifically focused on adolescent parricide cases is presented in Table 1. Estimates of the incidence of these various types of child maltreatment in the ten studies published prior to my study are likely to be conservative. The authors of these studies were not

### TABLE 1
#### EVIDENCE OF CHILD MALTREATMENT AMONG ADOLESCENT PARRICIDE OFFENDERS

| | Studies Involving Adolescents | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Wertham (1941) | Sargent (1962) | Scherl & Mack (1966) | Duncan & Duncan (1971) | Sadoff (1971) | Tanay (1973) | Corder et al. (1976) | McCully (1978) | Post (1982) | Russell (1984) | Heide (1992) |
| Total # cases | 1 | 5 | 3 | 5 | 2[a] | 8 | 30 | 1 | 4 | 60 | 75 |
| Total # parricide cases (F = Father) | 1 (F=0) | 5 (F=2) | 3 (F=0) | 5 (F=4) | 2 (F=1) | 8 (F=2-7) | 10 (F=8) | 1 (F=1) | 4 (F=3) | 8 (F=4) | 7 (F=5) |
| Child Physical Abuse | X | | | | | | | | | | |
| Spouse Abuse (Physical) | | X | X | X | | X | X | | X | X | X |
| Sexual Abuse | | | | | | | | | | | |
| Overt | | | | | | X | X | | X | X | X |
| Covert | X | X | X | X | | | ? | | | ? | |
| Forcible Rape | X | X | X | X | | X | | X | X | X | X |
| Verbal Abuse | | | | | | | | | ? | | X |
| Psychological Abuse | | | X | | X | X | | | X | ? | X |
| Physical Neglect | X | | X | X | X | X | | X | X | X | X |
| Medical Neglect | X | | ? | ? | X | | ? | | X | X | X |
| Emotional Neglect | X | X | X | | | | | | | | X |
| Emotional Incest | X | X | | X | | | X | X | | X | X |

[a]One adolescent (17-year-old) and one adult (22-year-old).

focused on exploring the link between child abuse and particide and did not provide definitions of abuse and neglect. In addition, they often did not characterize the parental conduct they described as abusive or neglectful. During the last decade the mental health field has become increasingly aware of more subtle types of child maltreatment and the damaging effects such conduct can have on children. Accordingly, it is likely that the authors specifically identified parental conduct as abusive or neglectful primarily when it was on the extreme end of the continuum of abuse. Thus, the absence of a specific type of abuse or neglect in a particular study may mean that such abuse did not exist or that evidence indicating or suggesting its presence was not provided.

Examination of Table 1 reveals that evidence of most specific types of abuse and neglect could be discerned across studies. Child physical abuse and spouse abuse were each identified in eight studies. In cases in which adolescents killed fathers or mothers, severe spouse abuse has frequently coexisted, often preceding child physical abuse (Corder et al., 1976; Duncan & Duncan, 1971; Heide, 1992; Post, 1982; Russell, 1984; Sargent, 1962; Tanay, 1973).

Covert sexual abuse was evident in 10 of the 11 cases. Some suggestion of overt sexual abuse was present in two studies. Forcible rape was indicated in one study and might have occurred in a second study. Psychologically and verbally abusive behaviors were clearly discernible in nine and six studies, respectively.

Physical neglect in terms of denial of basic needs (food, shelter, heat) was apparent in five of the 11 studies. The likelihood that the children were not protected from physical or emotional harm by the nonabusive parent was suggested in at least four of the remaining studies. Material relating to medical neglect was not presented by authors other than myself.

Data indicating that the children were emotionally neglected were presented in five studies. Emotional incest, a concept not specifically identified in studies published prior to mine, was clearly identifiable in eight studies.

## SUMMARY AND IMPLICATIONS

This article explored the incidence of specific types of childhood maltreatment in the author's sample of adolescent particide offenders. Examination of the ten studies of APOs published prior to my study indicated that various forms of child abuse and neglect could be identified in the works of others. The finding that child maltreatment was common to all 11 studies provides additional confirmation of its importance to understanding the phenomenon of adolescent particide.

Two other findings are particularly noteworthy. Evidence of covert

sexual abuse and emotional incest was present in ten and eight studies, respectively. These concepts are relatively new. It was not until the 1980s that attention focused on the damage that could result from more subtle forms of sexually abusive behavior and other boundary violations between parents and children (Heide, 1992).

The public is increasingly becoming aware of the harmful effects of child maltreatment (Donnelly, 1991). Although few severely abused children actually murder their parents, these children have a much greater risk of becoming delinquent or socially dependent than are children who are treated well by loving parents or guardians (Moore, 1987). Recent research by Heide and Solomon (1991) involving 40 women who were abused as children indicated that half of them had seriously entertained thoughts of killing their abusive parents prior to the age of 18. Preliminary analysis suggested that those who harbored particidal thoughts appeared to have been more severely covertly and overtly sexually abused, to have been subjected to more emotional incest, and to have exhausted other means of escape (suicidal attempts, running away) than those who did not harbor such thoughts. Reasons that those who had homicidal thoughts did not murder their parents often centered around their expressed beliefs that they lacked the speed, agility, or strength needed to effect the killing.

Particidal thoughts were among many coping strategies investigated. It appeared that other coping strategies enabled these women as youths to survive in their abusive environments without acting out violently towards others. Some of the coping strategies utilized by the 40 sample subjects as adolescents were adaptive. For example, 62% reported getting average or above average grades in elementary school and 55% reported achieving similar grades in high school. However, other coping strategies were maladaptive. For example, 75% reported having fewer friends and 70% reported participating less in school activities than other youths. Prior to age 18, 84% had seriously considered killing themselves and 32% had attempted to do so. More than half (52%) turned to food to feel better and acknowledged that weight was often a problem for them during their adolescence. Thirty-nine percent engaged in acts of self-mutilation, and 20% and 15% often turned to illicit drugs or alcohol, respectively, to feel better. Seventy-four percent indicated that prior to age 18 (not counting times that they had been drinking or using drugs), they had experienced periods of missing time. 70% were amnestic for large parts of their childhood after age 5, and 34% percent had found themselves in an unfamiliar place not sure of how they had gotten there (Heide & Solomon, 1991). Research currently underway is exploring differences in coping strategies used by those with and without abuse histories. Further research is needed in exploring what differentiates severely abused adolescents who kill from their counterparts who do not.

The findings reported herein underscore the need for education about the parameters of abuse and neglect. Parents who are informed about good parenting are less likely to abuse or neglect their children, because much child maltreatment is due to ignorance. Children who understand about child abuse are more likely to seek help than those who come to see this treatment as normal or deserved. Mental health professionals, school personnel, and social services staff who have a clear understanding of types of child maltreatment are more likely to intervene than those whose knowledge is limited. The educational system and the media have tremendous potential for helping to reduce the incidence of child maltreatment through educational efforts aimed at students and the general public (Heide, 1992).

## NOTES

[1] Caution is advised in generalizing from the literature on battered wives/women to battered children because the dynamics between the victims and offenders are not identical. For further discussion of battered women and the battered wife syndrome, see Browne (1987), Ewing (1987), and Walker (1979, 1984).

[2] In conceptualizing child sexual abuse, I build on the work of Middleton-Moz (1986) who distinguished between overt and covert sexual abuse, and Groth who noted that sexual offenses against children can consist of acts of molestation or rape depending on the characteristics of the approach and the dynamics of the offender (Burgess et al., 1978; Groth, 1981; Groth & Birnbaum, 1979).

[3] Covert sexual abuse is of course a culturally relative concept. The norms operating in a particular culture and time period determine what will be interpreted in the larger society as sexually explicit or provocative.

## REFERENCES

Ackerman, R. J. (1986, February). *Presentation on child abuse and neglect*. Second National Conference on Children of Alcoholics, Washington, DC.

Benedek, E. P., & Cornell, D. G. (1989). Clinical presentations of homicidal adolescents. In E. P. Benedek & D. G. Cornell (Eds.), *Juvenile homicide* (pp. 37–57). Washington, DC: American Psychiatric Press.

Blau, M. (1985, March 10). The twisting of Kenny White. *The Miami Herald*, pp. 10–17.

Bradshaw, J. (1988). *Bradshaw on: The family*. Pompano, FL: Health Communications.

Bradshaw, J. (1990). *Homecoming*. New York: Bantam Books.

Browne, A. (1987). *When battered women kill*. New York: The Free Press.

Burgess, A. W., Groth, A. N., Holmstrom, L. L., & Sgroi, S. M. (1978). *Sexual assault of children and adolescents*. Lexington, MA: Lexington Books.

Corder, B. F., Ball, B. C., Haizlip, T. M., Rollins, R., & Beaumont, R. (1976). Adolescent parricide: A comparison with other adolescent murder. *American Journal of Psychiatry, 133*(8), 957–961.

Donnelly, A. H. C. (1991). What have we learned about prevention: What should we do about it. *Child Abuse and Neglect, 15*(1), 99–106.

Duncan, J. W., & Duncan, G. M. (1971). Murder in the family. *American Journal of Psychiatry, 127*(11), 74–78.

Ewing, C. P. (1987). *Battered women who kill*. Lexington, MA: Lexington Books.

Gardner, M. (1985). *The deadly innocents: Portraits of children who kill*. New Haven, CT: Yale University Press.

Groth, A. N., & Birnbaum, H. (1979). *Men who rape: The psychology of the offender*. New York: Plenum.

Groth, A. N. (1981). *Chart of sexual offenders against children*. Webster, MA: Forensic Mental Health Associates.

Heide, K. M. (1984, November). *A preliminary identification of types of adolescent murderers*. Paper presented at the Thirty-sixth annual meeting of the American Society of Criminology, Cincinnati, OH.

Heide, K. M. (1992). Adolescent parricide offenders: Synthesis, illustration, and future directions. In A. Wilson (Ed.), *Homicide: The dynamics of the victim-offender interaction* (pp. 115–134). Cincinnati, OH: Anderson Publishing Comp.

Heide, K. M., & Solomon, E. P. (1991, November). *Responses to severe childhood maltreatment: Homicidal fantasies and other surviving*. Paper presented at the Forty-third annual meeting of the American Society of Criminology, San Francisco, CA.

Heide, K. M. (1992). *Why kids kill parents*. Columbus, OH: Ohio State University Press.

Holinger, P., & Klein, O. (1985). Murder and other homicide, by children under 15 in Finland. *Psychiatric Quarterly Supplement, 59*(1), 34–74.

Kirschner, D. (1992). Understanding adoptees who kill: Dissociation, patricide, and the psychodynamics of adoption. *International Journal of Offender Therapy and Comparative Criminology, 36*(4), 323–334.

Kidman, D. (1989). *A deadly silence*. New York: The Atlantic Monthly Press.

Leyton, E. (1990). *Sole survivor: Children who murder their families*. New York: Pocket Books.

Malinquist, C. P. (1971). Premonitory sign of homicidal aggression in juveniles. *American Journal of Psychiatry, 128*(4), 461–465.

McCarthy, J. B. (1978). Narcissism and the self in homicidal adolescents. *American Journal of Psychoanalysis, 38*, 19–29.

McCully, R. S. (1978). The laugh of Satan: A study of a familial murderer. *Journal of Personality Assessment, 42*(1), 81–91.

McGinnis, J. (1991). *Cruel doubt*. New York: Simon & Schuster.

Middleton-Moz, J. (1986, February). *Presentation on sexual abuse*. Second National Conference on Children of Alcoholics, Washington, DC.

Morse, P. (1991). *When a child kills: Abused children who kill their parents*. New York: Pocket Books.

Moore, M. (1987). *From children to citizens*. New York: Springer-Verlag.

Morris, D. (1985). *The kids next door: Sons and daughters who kill their parents*. New York: William Morrow.

Myers, W. C., & Kemph, J. P. (1988). Characteristics and treatment of four homicidal adolescents. *Journal of the American Academy of Child and Adolescent Psychiatry, 27*(5), 595–599.

Patterson, R. M. (1943). Psychiatric study of juveniles involved in homicide. *American Journal of Orthopsychiatry, 13*, 125–130.

Post, S. (1982). Adolescent parricide in abusive families. *Child Welfare, 61*(7), 445–455.

Prendergast, A. (1983, May 26). It's you or me, Dad. *Rolling Stone*, pp. 41–44, 66–67.

Reinhardt, J. M. (1970). *The poison tree*. New York: Avon Books.

Reinhardt, J. M. (1970). *Nothing left but murder*. Lincoln, NH: Johnsen Publishing.

Rosenthal, D. (1985, April 16). When a child kills a parent. *Parade*, pp. 6–9.

Russell, D. H. (1973). Juvenile murderers. *International Journal of Offender Therapy and Comparative Criminology*, *17*, 235-239.

Russell, D. H. (1979). A study of juvenile murderers of family members. *International Journal of Offender Therapy and Comparative Criminology*, *23*(2), 65-72.

Russell, D. H. (1984). Ingredients of juvenile murder. *International Journal of Offender Therapy and Comparative Criminology*, *28*(3), 177-192.

Sadoff, R. I. (1971). Clinical observations on parricide. *Psychiatric Quarterly*, *45*(1), 65-69.

Sargent, D. A. (1962). Children who kill—A family conspiracy. *Social Work*, *7*, 35-42.

Scherl, D. J., & Mack, J. E. (1966). A study of adolescent matricide. *Journal of the American Academy of Child Psychiatry*, *5*(2), 569-593.

Sorrells, J. M., Jr. (1981). What can be done about juvenile homicide? *Crime and Delinquency*, *16*(2), 152-161.

Tanay, E. (1973). Adolescents who kill parents—Reactive parricide. *Australian and New Zealand Journal of Psychiatry*, *7*, 263-277.

Tanay, E. (1976). Reactive parricide. *Journal of Forensic Sciences*, *21*(1), 76-82.

Walker, L. E. (1979). *The battered woman*. New York: Harper & Row.

Walker, L. E. (1984). *The battered woman syndrome*. New York: Springer Publishers.

Walker, L. (1989). *Sudden fury*. New York: St. Martin's Press.

Wertham, F. (1941). *Dark legend: A study in murder*. New York: Duell, Sloan, & Pearce.

Kathleen M. Heide, Ph.D., LMHC
Associate Professor
Department of Criminology
4202 East Fowler Avenue
Social Sciences, Room 107
Tampa, Florida 33620
U.S.A.

*Reprinted with permission of Sage Publications (Thousand Oaks, CA.*

Attachment 6



**FILED**

MAR 2 3 2009
COUNTY CLERK
ELLIS COUNTY, TEXAS

# SPARTAN PSYCHOLOGICAL
# CONSULTING

**Jacquelyn Pack, Ph.D.**
Licensed Psychologist
Email:drjpack@yahoo.com
Cell phone: 972-375-4305

**Robert Lackey, Ph.D.**
Provisionally Licensed Psychologist
spartanconsulting@charter.net
Cell phone: 817-988-1161

*The content of this psychological report is based on the clinical interpretations of the psychological results, behavioral observations and interview information in combination. The examiners will not be responsible for additional interpretations or uses that are made of any reported test scores, clinical findings or background information that are not contained within this report.*

Name: Austin Eversole
Date of Birth: 04/20/1993
Age: 15 years 11 months
Gender: Male
Evaluator: Jacquelyn Pack, PhD
Date of Evaluation: 03/19/2009

## Reason for Referral

Austin was referred for a psychological evaluation by the Ellis County Juvenile Probation Department to provide an estimate of his current intellectual and emotional functioning. Recommendations regarding proposed placement and treatment options were requested. All instruments used were approved by his defense attorney who agreed to allow Austin to be interviewed without his attorney present. The interview occurred in the Hunt County Juvenile Detention Center in Greenville, Texas where Austin is currently incarcerated. Austin states that he has not been charged with criminal activity at this time and refers to the altercation with his father as "the incident".

## Assessment Techniques

Mother Interview
Grandmother Interview
Clinical Interview
Mental Status Checklist
Review of Records

Wechsler Abbreviated Scale of Intelligence (WASI)
Adolescent Psychopathology Scale (APS)
Resiliency Scale for Children and Adolescents
Adolescent Anger Rating Scale (AARS)
Adolescent and Child Urgent Threat Evaluation (ACUTE)
Personal Problems Checklist for Adolescents

**Background Information**
Austin's mother, Pamela Sue Eversole was interviewed by telephone. Austin's
grandmother, Frances Eversole (Danny Eversole's mother) was also interviewed by
telephone. Although the details of each interview differ significantly, the parties both
agree that Austin was a "good kid" and had had a very difficult family life. All parties
refer to the divorce of Austin's parents as lengthy and traumatic. Both parties profess
their love and support for Austin. Both parties have visited him at the detention center.

School records indicate no significant academic difficulties. Austin had minor discipline
issues such as tardiness, violations of dress code and cursing. He spent time in In School
Suspension (ISS) for persistent misbehavior. Behaviors in the category are typically
minor but great enough in number to result in punishment. Austin's records indicate no
special services and that he had passed all required state assessments. Mother reports that
at the time he was in her custody and in 5th and 6th grade he was in special education due
to attention deficit disorder. At the time she states he was taking medication (Stratera)
for ADHD. Austin reports that in his last semester of math he received a failing grade of
67 although he believes that he failed primarily because he did not do his homework and
believes that he understands most of the concepts.

Mother reports that there was significant domestic violence toward herself and Austin,
that can be substantiated in the court's records of divorce proceedings. She specifically
states that father put a rope around Austin's neck and choked him, attempted to throw
Austin out of a moving truck, and bruised his bottom with a weight belt. Mother states
that Austin also witnessed severe physical abuse toward mother. Mother states that CPS
was called and an investigation was started but not completed to her satisfaction. She
states that she has pictures of injuries incurred by father.

All parties agreed that the divorce that occurred in 2000 was difficult and that mother was
awarded full custody initially. Mother and grandmother both state that Austin was
frequently picked up by his grandmother for the weekend while mother had full custody
rights. The custody stories vary at this point with mother stating that father went back to
court and received joint custody. She states there was a court order that she would move
to Red Oak and she states that she did so but was never allowed to see Austin. She states
that she would go to pick him up and no one would be there. Mother states that she
called but no one would answer. She reports one phone call from Austin to her around
his last birthday. She says that when she tried to call the number again it had been
disconnected due to Austin's misbehavior. Grandmother states that mother never called
or tried to visit. She reports one incident when mother called and she and stepsister

scheduled a time to come and visit but never showed up.

Mother reports depression in her mother and herself.  Grandmother reports no history of mental health problems on the father's side of the family.  Grandmother reports that Austin's mother has spent time in jail for using and selling drugs.  Mother did not address this issue.  Mother reports that father was charged with reckless endangerment and terroristic threats toward mother and Austin.  Grandmother states that although she heard her son [Austin's father] get "angrier than he should have" and say "terrible things" she says she never witnessed physical abuse of Austin by his father.

Both deny any violence by Austin toward friends or family.  Both say that Austin was always truthful even when he had done something wrong.  Both deny any drug use by Austin and grandmother says that her son had Austin tested within the last year[for drug use].

Grandmother states that she has visited Austin in the detention center a couple of times although her other grandson's are very angry at her for continuing any relationship with Austin.  Mother states that she visits at all visitation times and calls at the times allowed.

## Behavioral Observations and Clinical Interview

Austin is a fifteen -year-old male referred for psychological evaluation through Ellis County Juvenile Probation.  Austin presents as bright and articulate.  He is tall and thin and has dark circles under his eyes.  He demonstrates no overt signs of anxiety such as restlessness and participates with good attention to detail and without overt signs of emotion.  His mood appears calm without irritability or pessimism.  He denies any suicidal ideation and his thought processes are logical and coherent.  He reports no auditory or visual hallucinations now or in the past.  He reports that he does engage in some compulsive behaviors that he believes keep him safe.  For instance he feels required to count items and feels less anxious if there is an even number.  He reports that this does not interfere with his life activities; he never has to return to the point of origin to achieve an even number and is never late due to counting.  He reports no change in eating since the incident but several recent changes in his sleep pattern including insomnia, frequent wakening, inability to fall asleep and greater fatigue.  He reports that he is "extremely picky about his clothes" and that "they have to be perfect".  It seems this may be causing some distress.  He reports that he participates in track, football, and Boy Scouts, takes photographs for the school newspaper and likes music.  He says that he does not have a regular girlfriend but has been on dates and has a lot of friends on whom he can depend.

Austin's report of the custody change is consistent with that of the mother and grandmother.  He reports that he lived with his mother until intermediate school and then without warning or explanation was sent to live with his father.  He states that at first he liked it but that he did not understand that he would never be able to see his mother.  He reports that verbal abuse started about 3 months after the move and threats and physical abuse started soon after.

Austin reports a long history of physical, emotional and verbal abuse by his father. He denies all sexual abuse.  He states that he has flashbacks to his father hitting his mother. He perceives that he had no support from his father.  It is his opinion that his father kept his mother away from him with threats. Austin reports that he "would have run away but his father said he "would run him over with the truck if he even tried it." He reports that he told his father to "get some help" because his father was so abusive.  In the APS he stated that he sometimes felt "like he was going to die" and when asked for clarification he stated that dad said "he was going to kill him." He also states that he sometimes feels like things are not real and when asked for clarification he reported "only the incident".

Austin states that he feels guilt about the incident, but that he also "feels safe now, even if it is in jail." He appears relatively unemotional about the incident and is surprised by the fact that he is in isolation because he may be a threat to others.  He does not demonstrate any anger or impulsiveness. He does not blame anyone for his circumstances but believes that "things will be OK".  He states that religion is important to him and that he failed in his religious beliefs but that he believes God will forgive him and hopes his grandmother and half siblings will forgive him. He plans to go to college and become a teacher and maybe a part time pastor.

## Intellectual Functioning
Austin was evaluated with the Wechsler Abbreviated Scale of Intelligence (WASI). It is an individually administered measure of intelligence designed for use with individuals aged from 6 to 89. The four subtests of the WASI tap various facets of intelligence, such as verbal knowledge, visual information processing, spatial and nonverbal reasoning, and crystallized and fluid intelligence. Austin's overall performance on this measure indicated that he is functioning in the High Average Range of Intelligence. He achieved an IQ of 117 ((FSIQ (2); 87th percentile, 95% confidence interval (109-123)). This is likely an underestimate of Austin's true IQ. Although he attended well and appeared to attempt items and think about the answers, he is reporting signs of depression that frequently suppress true IQ scores.

## Emotional Functioning
A validity check on Austin's Adolescent Psychopathology Scale was unremarkable.  His scores on the Response Style Indicator s suggest that he answered the items in a forthright manner.  His Lie Scale score was in the average range.  His Consistency Response score was in the average range.

Austin had two elevated clinical scores on the APS:  Separation Anxiety (T=78) and Major Depression (T=65).  The elevated Separation Anxiety Score is likely reflective of Austin's stressful confinement situation. He is currently separated and anticipates long term separation from his mother, grandmother and siblings.  Austin demonstrates both the primary and secondary symptoms of a Major Depressive Disorder, including, emotional components of dysphoria, cognitive aspects such as low self worth and guilt and vegetative symptoms such as sleep difficulty, fatigue and loss of energy.  Scores in this range occur in about 4% of the standardization sample. Again, this level of elevation is

likely a result of his current circumstances rather than a longstanding psychological disorder. This area certainly should be monitored in the future.

Austin received an elevated but subclinical score (T=62) on the Obsessive-Compulsive (OC) Personality Disorder. Specific OC items assess need for control, perfectionistic behavior and the need for orderliness, rules and schedules. This tendency was likely present prior to the incident but is likely an adaptive response for an adolescent who feels that he had no control over many of his life circumstances.

Austin's overall responses to the Adolescent Anger Rating Scale are all in the moderately low or average range when compared to others of the same age and sex. This is consistent with his self report and the report of school, his mother and grandmother. His Instrumental Anger score was in the average range (T=41). Instrumental anger is a negative emotion that triggers a delayed response resulting in a desired and planned goal or revenge or proactive aggression which is marked by threatening and bullying others. Austin appears to be able to plan to avoid arguments and walk away from arguments. His score on the Reactive Anger scale which measures an immediate angry response to a perceived negative, threatening or fear provoking event is in the moderately low range (T=36). Reactive anger results in an impulsive response to an anger provocation. The final scale, Anger Control was also in the moderately high range (T=68). This is considered a positive score. Anger control strategies are used to decrease negative responses to either type of anger. Overall, Austin's feels and demonstrates very little anger toward himself or others. He controls his anger better than most adolescent boys his age.

The ACUTE is useful in making clinical decisions about an adolescent's risk assessment for violence. The ACUTE was developed and tested on children and adolescents ages 8 to 18 years who had threatened violence to themselves or others. The ACUTE requires the examiner to obtain information from additional sources and requires the integration of collateral information into the interpretation of the assessment. The following clinical risk cluster scores were in the low clinical risk range: Threat, Precipitating Factors, Early Precipitation Factors, Late Precipitation Factors, and Impulsivity. There was one score elevated into the moderate clinical risk range: Predisposing Factors. The Predisposing Factors Cluster indicates a family history of violence, family substance abuse, family psychiatric illness, attention disorders and poor social support. The facets examined by the Predisposing Factors cluster are less acute than the other cluster scores but still represent significant and recognizable manifestations of psychological vulnerability.

It is possible and likely for risk factors to fluctuate in severity over a period of time and under different circumstances and in other settings. Reassessment is encouraged if there is a change in setting. It is likely the cluster scores would have been higher when Austin was living with his father.

## Treatment Amenability
The Resiliency Scales were designed to systematically identify and quantify core personal qualities of resiliency in youth. Austin reported an average Sense of Mastery in

all areas including Optimism (positive attitudes about life and one's own competence), Self-Efficacy (the ability to solve problems) and Adaptability (the ability to be personally receptive to criticism and to learn from one's mistakes).

His Sense of Relatedness was average and consistent with his interview. He reported an average Sense of Relatedness in all areas including Sense of Trust (cognitions and expectations about the trustworthiness of others) Access to Support (belief that there are others to whom he can turn to when dealing with adversity), Comfort with Others (degree that an individual can be in the presence of others without discomfort or anxiety), and Tolerance of Differences (belief that he can safely express differences within a relationship).

His Emotional Reactivity was average in the areas of Sensitivity (the threshold for reaction and the intensity of the reaction), Impairment (the degree to which he is able to maintain an emotional equilibrium when aroused), and Recovery (the ability to bounce back from emotional arousal).

Both his Resource Index and his Vulnerability Index were in the average range. This indicates that Austin perceives that he has sufficient internal and external supports that are necessary for him to succeed. He perceives that he has average access to support and expects others to be trustworthy and available to help him. He has average emotional reactivity, which indicates that he is likely to react to adverse events in an age appropriate manner. His overall Vulnerability Score is average indicating that overall his resources and emotional reactivity are balanced.

## Diagnostic Impressions

| | |
|---|---|
| Axis I | None |
| Axis II | None |
| Axis III | None |
| Axis IV | Problems related to interaction with the legal system |
| | Problems with Primary Support Group |
| Axis V | GAF   70 |

## Conclusions

Austin demonstrates no cluster of symptoms that indicate probability of a mental health disorder. He is at risk for depression and post traumatic stress disorder and these areas should be periodically assessed especially when a change of environment occurs. He has some symptoms of an obsessive compulsive personality disorder but this is not uncommon during adolescence and usually personality differences are resolved by adulthood. These symptoms may increase or decrease with his perception of the control he has over his environment. Again, this is not currently an area of concern but should be monitored.

Austin does appear to be a victim of abuse. Austin's self report of his life and activities are consistent with school records, mother's report and grandmother's report indicating

that he is generally truthful and does not lie to escape responsibility or enhance other's opinions.

This assessment indicates that Austin has adequate self control and is not likely to act aggressively. He has many protective factors including a positive attitude toward intervention and authority, strong attachments and bonds, strong social support, pro-social involvement and resilient personality traits. Risk assessment should be conducted any time the environment changes.

Austin appears less sophisticated than many 15 year old adolescents. He does not have a history of crime or delinquent peer involvement. He does not appear to fully understand the life long consequences of his actions. As he understands this more fully he is likely to require long term counseling to maintain his current resiliency.

### Recommendations

Austin should be encouraged to continue his education. He appears to be motivated to continue his education post high school. He should receive vocational counseling so that he may consider employment consistent with his background.

Austin will require counseling to recover from his reported physical and emotional abuse. He will also benefit from strategies to reduce the risk of post traumatic stress disorder and depression.

Austin should be coached in respectfully demanding immediate assistance if he is bullied or abused in any setting. He is at risk for further abuse in a detention setting and should be allowed and encouraged to express concerns to someone he trusts.

Before considering returning Austin to any of his previous care takers an exhaustive home study should be conducted to eliminate further exposure to neglect and or illegal substances in the home.

Austin does not appear to be a danger to himself or others at this time and the detention center should consider this in determining his long and short term placement.

Austin should remain supervised during and after any incarceration and probationary period. Periodic reevaluations of clinical disorders, anger management and environmental stressors are warranted.

Jacquelyn Pack Ph.D. L.P., L.S.S.P.
Licensed Psychologist
Licensed Specialist in School Psychology